# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CHRISTIAN SCHANK, | ) | |
| CAMERON SCHANK and | ) | |
| DEANNA MATTHEWS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 2025-0208-SEM |
| | ) | |
| ARIZONA ISOTOPES SCIENCE | ) | |
| RESEARCH CORPORATION, | ) | |
| a Delaware corporation, | ) | |
| | ) | |
| Defendant. | ) | |

Final Post-Trial Report: October 30, 2025
Date Submitted: July 31, 2025

## FINAL POST-TRIAL REPORT

Robert L. Burns, Nicole M. Henry, Brendan W. Clark, RICHARDS, LAYTON & FINGER, P.A., Wilmington, DE; *Counsel for Plaintiffs*.

Richard I.G. Jones, Jr., Periann Doko, Harry W. Shenton, IV, Charmi A. Patel, BERGER MCDERMOTT LLP, Wilmington, DE; *Counsel for Defendant*.

**MOLINA, Senior Magistrate**

Eschewing a streamlined paper record trial, the parties tried this books and records action over two nonconsecutive days, calling four witnesses, and introducing over 300 exhibits. The deep and personal history preceding this action complicated the matter even further. In several ways, the record before me is reminiscent of my guardianship and traditional equity docket; a serendipitous, unanticipated overlap.

But the legal issues before me are straightforward. The plaintiffs, stockholders of the corporate defendant, ask that I order the defendant to disclose additional information. Specifically, they ask for (1) all records demanded in the operative demand, (2) removal of certain redactions in documents already produced, (3) certification when production is complete, and (4) no restrictions on stockholder communications related thereto. The plaintiffs also argue that the defendant has engaged in bad faith litigation and fees should be shifted in their favor. The defendant contends the plaintiffs are the bad faith actors, fees should be shifted in its favor, and no further production or disclosure is warranted.

For the reasons explained herein, I issue a mixed ruling, requiring limited production, shifting costs, but declining to shift fees. This is my final report.

## I.      BACKGROUND

Through this action, Christian Schank, Cameron Schank, and Deanna Matthews (the "Plaintiffs") seek to inspect certain books and records of Arizona

Isotopes Science Research Corp (the "Defendant").[1] Before addressing the merits of their request, I provide a brief factual background. The following facts are drawn from the parties' stipulations in the pretrial order, 314 exhibits,[2] four deposition transcripts, and testimony presented at our 1.5-day trial held on June 3, 2025 and June 17, 2025.[3]

## A. The Parties

The Defendant, a "nuclear medicine and radionuclide manufacturing company specializing in developing and producing medical isotopes and research[,]" was founded in 2017.[4] At its helm, Gregory "Wade" Brooksby serves as president and chief executive officer, while his father, Brandt Brooksby, serves as chairman

---

[1] The parties' jointly submitted exhibits are cited as "JX__." Deposition testimony is cited to as "[First Name] Dep." I grant the evidence before me the weight and credibility I find it deserves.

[2] Although the joint exhibit numbering begins at 1 and ends at 451, there are gaps. The parties submitted, and I admitted, joint exhibits 1 through 192, 200 through 270, and 400 through 451, totaling 314 exhibits.

With their post-trial brief, the Plaintiffs submitted an additional document in what they say was "not in an attempt to supplement the trial record, but to alert the Court to what appears to [be] a planned attempt to violate the" stipulated order "postpon[ing] [the 2025 annual meeting] until at least sixty (60) days after the entry of the Court's final judgment" in this action. Docket Item ("D.I.") 67 at 22–23 (citing the parties' stipulated agreement, which I approved (D.I. 29)). The Defendant responded on July 16, 2025, reiterating that it has no intention of violating the stipulated order. Relying on that response, I need not address the issue further.

[3] *See* D.I. 47 ("Pretrial Order"); D.I. 61, 65 (trial transcripts). I cite to the trial transcripts in the form "[First Name] Tr."

[4] Pretrial Order p. 23 ¶ 52; JX2.

of its board of directors, and handles the treasury, accounting, and tax matters.[5]

Leading the Defendant's research until his passing in 2024 was Clyde Jupiter, a "world-renowned scientist on nuclear safety[.]"[6]

The Defendant's certificate of incorporation, dated September 29, 2017, authorized it to issue 10,000,000 shares of common stock, and 2,500,000 shares of preferred stock.[7] On the day of incorporation, husband and wife Clyde and Patricia "Pat" Jupiter (the "Jupiters") were issued 1,000,000 shares of the Defendant's common stock;[8] overtime their interests grew and by 2023, the Jupiters owned 1,157,143 shares.[9] The record also includes two promissory notes through which the Defendant promised to repay to the Jupiters $3,200,000 with interest (the "Jupiter Notes").[10]

---

[5] Christian Tr. 22:9–13; Brandt Tr. 235:6–14. Throughout this post-trial decision, I may use first names for clarity and intend to suggest no familiarity or disrespect.

[6] Brandt Tr. 240:14–15. There are conflicting views regarding Mr. Jupiter's role with the Defendant, particularly whether he was a true co-founder, or given that title merely honorarily. *Contrast, e.g.*, JX122 at 3 (Sheldon L. Trubatch, the Defendant's corporate secretary, referring to Mr. Jupiter as the Defendant's "founder"), *with* Brandt Tr. 285:11–16 (denying that Mr. Jupiter was the Defendant's co-founder, instead referring to Mr. Jupiter as the Defendant's "senior scientist"). Differing points aside, Mr. Jupiter clearly was of great value to the Defendant.

[7] JX2 at 1. The certificate of incorporation was amended on September 14, 2019, providing only for authorization to issue 10,000,000 common shares (*i.e.*, eliminating the preferred stock). JX2 at 4.

[8] JX214 at 5.

[9] Brandt Tr. 254:1–256:17; JX172 (showing the Defendant's stock ledger).

[10] JX204; JX205. These notes are not reflected in the Defendant's financial statements. Brandt Tr. 302:7–9. The Plaintiffs contend the Defendant's financial statements are not

3

Formalities aside, the Defendant is a bit of a family affair, which has split into factions: the Brooksby side and the Jupiter side. On the Brooksby side are Wade and Brandt, the Defendant's president/CEO and chairman respectively and Wade's parents-in-law, George (a/k/a Sam) and Saundra Parker, who were also the Defendant's largest investors.[11] George has since passed and the Plaintiffs have questioned the accuracy of how the Parkers' interests are reflected in the Defendant's stock certificates and Saundra Parker's capacity to vote any remaining shares.[12] Per Christian, the Parkers' shares are held in trust by the Parkers' son, Kevin, Mrs. Parker does not have the authority or capacity to vote, and the Brooksby's are exploiting Mrs. Parker's vulnerabilities.[13]

Then, on the Jupiter side, there was the Jupiters (recall Mr. Jupiter passed in 2024) and their family, which includes the Plaintiffs. The first plaintiff is Christian Schank, Mrs. Jupiter's son and Mr. Jupiter's stepson. He has held stock in the

---

accurate because they do not reflect the Jupiter Notes and use this to support their credible basis argument. *See* D.I. 59 ("Pretrial Conference Tr.") at 24:22–26:4. Christian testified he was unaware of the Jupiter Notes "at the time the demand letter was made." Christian Tr. 93:14–15.

[11] JX3 (showing 2,000,000 shares issued to George R. and Saundra L. Parker on October 2, 2018); JX4 (showing George R. Parker was a director of the Defendant in August 2019). Before his passing, George also went by "Sam" and "Sammy." Lisa Tr. 334:8–12.

[12] *See* Christian Tr. 57:12–59:16.

[13] *See* Christian Tr. 60:8–19, 62:1–24, 64:1–4.

Defendant since 2020, and at the time of trial owned 500,000 shares.[14] The two other plaintiffs are Cameron Schank, Christian's son, who holds 4,000 shares, an investor since 2020,[15] and Deanna Matthews, Christian's sister, a stockholder since 2019, who holds 10,000 shares.[16] Together, the Plaintiffs own more than 5% of the Defendant's issued stock.[17]

Before Mr. Jupiter's death, the two sides appear to have been much closer. For example, Brandt assisted many of the Defendant's investors, including the Jupiters, with their finances.[18] Brandt even lived with the Jupiters for "[s]ix or seven years."[19] Brandt also helped Christian to reduce the amount of tax he might pay when

---

[14] Pretrial Order p. 23 ¶ 48. Additional members of Christian's family also own stock in the Defendant. Christian Tr. 7:20–8:13.

[15] Pretrial Order p. 23 ¶ 49.

[16] *Id.* at p. 23 ¶ 50.

[17] *Id.* at p. 3 ¶ 4. This record of family ownership has some friction with the Defendant's policy to exclusively distribute shares to accredited investors. *See* JX64 at 1, 4 (stating that the Defendant "sells stock to only accredited investors as part of its corporate strategy"). The Defendant purportedly assesses potential investors' accreditation by having them sign a private placement memorandum "acknowledging that [they are] an accredited investor as defined by the U.S. Securities and Exchange Commission . . . or other regulatory body." *See* JX5 at 1 (displaying an executed private placement memorandum, signed by the Defendant and Jeffrey and Deanna Matthews). But one of the Plaintiffs, Cameron, "was not given a [p]rivate [p]lacement [m]emorandum and was not informed that he was not entitled to the future distribution of [f]inancial information[.]" JX58 at 6. Rather, he was permitted to purchase shares in the Defendant, which ultimately caused problems—more on that later.

[18] Brandt Tr. 238:7–19.

[19] Brandt Tr. 238:20–239:20.

selling his home, and did the same for Christian's daughter to reduce her state taxes.[20] But those relationships have since soured.

For example, Wade testified to a difficult call with Christian in May or June of 2024.[21] Christian would call Wade about every quarter seeking an update on the Defendant's performance for himself and his family.[22] But, per Wade, the May or June 2024 call went off the rails. He testified that Christian pressed him on whether the Defendant would be issuing dividends at the end of the year and how much he could expect as a stockholder.[23] Wade did not provide an answer, which caused Christian to grow frustrated and suspicious, accusing Wade of some level of fraud or misrepresentation. In this frustration, Wade contends Christian turned to other matters like Mr. Jupiter's estate and Mrs. Jupiter's treatment; matters Christian denies discussing with Wade. Wade also recalls Christian making a final promise: that he was going to make the Brooksbys' lives miserable. But, per Christian, the notion that he made such a promise is "completely untrue."[24]

---

[20] Brandt Tr. 267:16–268:8.

[21] Wade Tr. 160:1–164:17.

[22] *See* Wade Tr. 146:2–15.

[23] The Defendant did ultimately declare a dividend (JX445) but, per Wade, Christian "said it was irresponsible[.]" Wade Tr. 178:21–179:7.

[24] Christian Tr. 45:24.

## B. Litigation Ensues

This action was not the first time the Brooksbys and Jupiters have been on opposite sides. I will only highlight the proceedings most pertinent to understanding the dynamics of this action.

The first two are highly personal. In 2007, Mrs. Jupiter appointed Brandt as her agent under a durable financial power of attorney.[25] But, when Mrs. Jupiter needed the support of a guardian and conservator, her son, Stephen, rushed to a court in Utah to offer his services. Stephen was appointed in an interim, emergency capacity on June 3, 2024.[26] The next day, on June 4, 2024, Brandt petitioned to have Stephen's appointment rescinded, arguing the power of attorney gave him preference.[27] By November 2024, the parties stipulated to Stephen continuing as guardian, but could not agree on who should serve as conservator.[28] Ultimately, on March 20, 2025, the Probate Court in the State of Utah, Farmington District Court, issued a decree appointing Stephen as conservator.[29]

That dispute spilled over into the probate of Mr. Jupiter's estate. On November 7, 2024, Brandt sought his appointment as special administrator for Mr.

---

[25] JX407 at 10.

[26] *See* JX407. Mrs. Jupiter is Stephen's mother. Pretrial Order p. 30 ¶ 81.

[27] JX407.

[28] JX408 at p. 4 ¶ 3.

[29] Pretrial order p. 30 ¶ 81.

Jupiter's estate, pending appointment of a general personal representative.[30] On December 2, 2024, Christian and Stephen filed their opposition to Brandt's application.[31] Christian has not sought his appointment in Brandt's place but is, instead, supporting his stepsister. Those competing applications remained pending at the time of our trial.

The parties are also engaged in hotly contested commercial litigation. On May 2, 2025, Stephen, as Mrs. Jupiter's conservator, sued the Defendant in Utah for breach of contract related to the Jupiter Notes.[32] There is also litigation in Utah about control over the Parkers' shares of the Defendant.[33] At the time of trial, these actions remained pending.

---

[30] JX410.

[31] JX75. Christian testified that he is not now, and has not ever, sought to be the personal representative of Mr. Jupiter's estate. Christian Tr. 42:2–4. He also testified that he is not named in the estate action, has no blood relation, is not named in the will, and that "there's very little in the estate." Christian Tr. 42:5–14. These are the same arguments that were made in the conservatorship dispute. *See* JX81. According to Christian, there is no possible financial gain he could get out of the conservatorship action—"the only thing [he can] gain is knowing that [his] brother is a saint and that he is taking care of everything. He refuses compensation. That's it." Christian Tr. 40:15–20. But Wade thinks that, in what he says are Christian's own words, if he can gain access to the trust he can "pay for a lot of things." Wade Tr. 212:1–15.

[32] JX420.

[33] *See* JX179 (referring to the Utah litigation).

## C. The Defendant's Business

The Defendant remains in business. It has not, however, held a DGCL-compliant annual stockholders meeting since 2019.[34] The Defendant did not provide stockholders with written or electronic notice of any annual stockholder meetings for calendar years 2020, 2021, 2022, 2023, and 2024,[35] and the parties dispute whether stockholders were provided financial reports from the Defendant during this time. The Plaintiffs do, however, concede that some information has been provided.

The Defendant updated stockholders generally on the business and its operations quarterly from 2020 through 2023. Then, in or around 2024, it

---

[34] Pretrial Order p. 23 ¶ 53 ("From 2020 to present, the [Defendant] has not held an annual meeting of stockholders as such term is defined under the DGCL."). In its answer, the Defendant represented that it held annual stockholder meetings in 2020 and 2023, though it later conceded that was untrue. *Contrast* JX140 at 18 (the Defendant's answer) ("The [Defendant] states that it held stockholder meetings in 2020 and 2023 and has recently scheduled and noticed its 2025 stockholder meeting."), *with* Wade Dep. at 61:2–65:3 (explaining that the Defendant held meetings on a "yearly basis" when it could, which included the years 2021 and 2022, but not 2020 and 2023). Despite not holding DGCL-compliant meetings, Wade testified that the Defendant did hold annual meetings generally in 2019, 2020, 2022, and 2024. Wade Tr. 150:18–21.

[35] Pretrial Order p. 23 ¶ 54.

transitioned to providing updates every six months.[36] In Christian's view, these updates "provided generalizations" and "[n]o real financial or other information[.]"[37]

### D. The Demands

Growing concerned about the generalized information we was receiving, on November 14, 2024, Christian served the first books and records demand predicating this action, advancing two purported purposes: (i) valuation, and (ii) investigation of potential mismanagement or wrongdoing by the Defendant's directors and officers

---

[36] *See* Christian Tr. 22:14–20 (Q: "So did AZI send any written updates to stockholders?" A: "They did quarterly. And then about a year ago they stated they were too busy to do quarterly and they're going to make them biannual. But they provided generalizations. No real financial or other information."); JX11 (February 4, 2021 email providing Q4 2020 investor update); JX15 (April 16, 2021 email providing Q1 2021 update); JX16 (July 20, 2021 email providing Q2 2021 and project update); JX17 (February 8, 2022 email providing Q4 2021 update); JX19 (February 5, 2023 email providing Q4 2022 update); JX22 (April 18, 2023 email providing Q1 2023 update); JX24 (July 25, 2023 email providing Q2 2023 update); JX25 (October 20, 2023 email providing Q3 2023 update); JX27 (February 26, 2024 email providing Q4 2023 update). The Defendant updated investors every six months in 2024. *See* JX41 (June 27, 2024 email, addressing January through June 2024); JX87 (December 26, 2024 email, addressing July through December 2024).

[37] *See* Christian Tr. 22:19–20; *see also* Christian Tr. 23:4–9 (Q: "So did these written updates provide you with enough information for your purposes as a stockholder?" A: "I'm unaware of a single stockholder who found them to be adequate. Every stockholder I've spoken to has said that it doesn't say much."); *compare* JX11 at p. 2 (providing an investor communication for Q4 2020 discussing the building of the AZI site and the use of the cyclotron, but not discussing the Defendant's financial status), *with* JX17 at p. 2 (providing an investor communication for Q4 2021 discussing the industry growth in Indiana and listing interested customers, but not discussing the Defendant's financial status), *and with* JX19 at p. 2 (providing an investor communication for Q4 2022 discussing the expansion of the customer base for certain isotopes, but not discussing the Defendant's financial status).

("Christian's Demand").[38] The Defendant refused production in response to Christian's Demand three days later, on November 17, 2024, arguing that: (i) Christian had not established the relationship between his requests to the valuation of his shares, (ii) Christian failed to state a credible basis for alleged mismanagement, (iii) under the SEC the Defendant was not required to produce detailed financial information in response thereto, and (iv) the investors' executed private placement memoranda "clearly limit[] the distribution of [the Defendant's] financial information to shareholders who each own at least 10% of [the Defendant's] authorized stock."[39]

A few days later, on November 19, 2024, Christian, in his capacity as Cameron's power of attorney, submitted a written inspection demand asserting the same purposes as Christian's Demand, in addition to communicating with other stockholders ("Cameron's Demand").[40] Cameron's Demand proved more complex than Christian's Demand, though. The Defendant's policy was to exclusively distribute shares to accredited investors, who were required to sign a private placement memorandum "acknowledging that [they are] an accredited investor as defined by the U.S. Securities and Exchange Commission . . . or other regulatory

---

[38] JX54.

[39] JX56.

[40] JX58.

body."[41] But Cameron, "was not given a [p]rivate [p]lacement [m]emorandum and was not informed that he was not entitled to the future distribution of [f]inancial information[.]"[42] In response to Cameron's Demand, the Defendant explained the board had "voted to void . . . Cameron's purchase of stock and to return his purchase prices[,]" and sent a check for $4,000 (Cameron's stock purchase price) because his "purchase was contrary to [the Defendant's] requirements, [and] the Board consider[ed] that [Cameron] was never a bona fide shareholder because he obtained his stock in a manner contrary to [the Defendant's] requirements."[43] An internal email from the Defendant's corporate secretary to its board members on November 22, 2024, revealed that in order to "prevent" the "release [of] sensitive financial information [about the Defendant] that could harm its competitive position[,]" the board voided Cameron's shares.[44] The Defendant has since changed its position,

---

[41] *See* JX64 at 1, 4 (stating that the Defendant "sells stock to "only accredited investors as part of its corporate strategy"). *See* JX5 at 1 (displaying an executed private placement memorandum, signed by the Defendant and Jeffrey and Deanna Matthews).

[42] JX58 at 6.

[43] JX68 at 3.

[44] JX173 at 155. Wade clarified at his 30(b)(6) deposition that the Defendant "made the responsibility [of investigating whether an investor was an accredited investor] that of the investors to do that, and if they signed the [private placement memorandum], then they signed it as a witness that [they] were [an] accredited investor," Wade Dep. at 120:5–11, and "assumed that [Cameron] had [signed one] because everybody was required to do so" so when Christian represented that Cameron was not one, the Defendant "assumed . . . that [Cameron] signed it fraudulently." Wade Dep. at 148:2:7 Assuming fraud, his shares were canceled. Wade Dep. at 148:6–7.

however, and has rescinded its purported voidance.[45] The Defendant now concedes that Cameron is a stockholder of the Defendant.[46]

Also on November 19, 2024, Christian sent a demand on behalf of Deanna, under both Section 220 and her rights under the private placement memorandum, citing the same purposes as her family, as well as the Defendant's failure to hold statutorily required annual stockholder meetings, and again seeking to communicate with other stockholders ("Deanna's Demand").[47] Like with Christian's Demand and Cameron's Demand, the Defendant refused production in response to Deanna's Demand, citing insufficient evidence to support the mismanagement claims, disputing that the failure to hold annual meetings constituted mismanagement, and explaining that only investors holding a sufficient amount of stock were entitled to access the information sought.[48]

Then, on November 26, 2024, Christian sent another demand, on his own behalf, with the same purposes identified in the demands he sent on behalf of Cameron and Deanna, raising particular issue with the Defendant's failure to hold annual stockholder meetings ("Christian's Second Demand).[49] Christian's Second

---

[45] Wade Dep. at 134:6–11.

[46] Pretrial Order p. 23 ¶ 49.

[47] JX59.

[48] JX62 at 3.

[49] JX72. Christian's Second Demand had a more pointed tone reading, for example: "[The Defendant] contends to have the technical skill to operate a 70 megavolt cyclotron. Surely

Demand was not well taken, and in its December 5, 2024 response, the Defendant dug in its heels, reiterating its compliance with Delaware law and firing back at purportedly "defamatory" statements, demanding that Christian cease and desist.[50]

Finally, through newly retained counsel, Christian submitted yet another written demand on February 12, 2025.[51] The parties have treated this as the operative demand in this action (the "Demand"). The purposes articulated in the Demand are for (i) communication with other stockholders regarding mismanagement concerns, (ii) valuation, and (iii) investigating potential wrongdoing.[52]

Through the Demand, the Plaintiffs seek production of fourteen categories of documents:

1. Current copies of (i) [the Defendant]'s stock ledger and (ii) a list of its stockholders;

2. Documents sufficient to confirm the name and identity of each board member of [the Defendant] as of (i) January 1, 2019, and (ii) to the extent the board composition has changed since such date;

3. Copies of [the Defendant]'s financial statements for the last 12 calendar months, including [the Defendant]'s (i) most recent audited financials and (ii) unaudited financial statements for any stub period thereafter (including, for the avoidance of doubt, the period from January 1, 2024 through present);

---

you [the Defendant] won't claim that [the Defendant] can't figure out how to do annual meetings and voting by [Z]oom." JX72 at 6.

[50] JX78.

[51] JX111.

[52] *Id.* at 4.

4. Copies of [the Defendant]'s records, including board minutes, correspondence, and related materials for all board meetings since January 1, 2019, including but not limited to (a) any documents which purport to show the valuation of [the Defendant] as a private corporation and (b) any documents which purport to show management's valuations of the corporation at any other date[;]

5. Copies of written consents and/or meeting minutes (including records of any votes taken or resolutions adopted) and notes of any meetings of the board of directors of [the Defendant] or any board committee, as well as any presentations made to the board or any committee regarding (i) consideration of and approval of any financial transaction of [the Defendant]; (ii) regarding any stockholder meeting or plans to hold a scheduled stockholder meeting; and (iii) regarding any annual or adjourned meeting of the board[;]

6. Copies of any records, including notices, regarding the election of directors of the board;

7. Copies of any executive compensation records of [the Defendant]'s officers and members of [the Defendant]'s board of directors;

8. Copies of all records (including relevant discussions contained in email communications, text messages, WhatsApp chats or similar messaging platforms from, to, or between board members), including records valuating [the Defendant]'s public shares and private shares;

9. Copies of all records of annual and adjourned meetings of [the Defendant], including minutes from the annual and adjourned meetings, agendas from the annual and adjourned meetings, and notices of the annual and adjourned meetings sent to stockholders as required by the DGCL;

10. All written consents of the stockholders to any board action;

11. Copies of all operating agreements, charters, and other management documents of [the Defendant];

12. Copies of all corporate bylaws, including any amendments or proposed amendments to the bylaws;

13. Copies of all board records, including minutes, resolutions, and written consents, documenting the vote to void the 4,000 shares of stock held by Cameron Schanks;

14. Complete copies of all [the Defendant]'s current directors' and officers' liability (or equivalent) insurance policies, binders, supplements, and agreements.

The Defendant responded to the Demand on February 17, 2025, averring that the "overall purpose is improper and supersedes any proper purpose[,]" but that it nonetheless "decided to grant a limited number of [the Plaintiffs'] requests, in accordance with Delaware law, by tailoring [its] responses to address the purposes of those requests as if they were proper."[53] The Defendant further noted Christian's own concession that he has had frequent communications with those involved with the Defendant, through which he remained apprised of its progress, contrary to his assertions that he has been kept in the dark.[54] The Defendant also accused Christian of utilizing the Demand as yet another means to "defame" Brandt through a "concerted campaign" against him.[55]

As such, the Defendant placed guardrails on the books and records it agreed to produce. Specifically, it explained it would: (1) offer a list of the names of

---

[53] JX122 at 3.

[54] *Id*.

[55] *Id.* at 3–4.

stockholders and their email address, with some redactions, (2) decline access to the stock ledger because information like "the number of shares held by each stockholder . . . does not support [his] limited purpose of knowing the names and address[es] of the stockholders in order to communicate with them"[56] and the Defendant's status as a privately placed company through the SEC heightens privacy concerns, (3) produce a list of the publicly available names and addresses of board members since 2019, (4) make available to all stockholders the most recent balance sheet and profit and loss statement for the year 2024, after appropriate confidentiality agreements are in place, (5) disclose "purely factual documents" to the extent doing so can satisfy Christian's requests, and (6) provide an "up to date set of [the Defendant's] Bylaws."[57]

But in doing so, the Defendant made repeated jabs at Christian and reiterated that "it is crystal clear that [Christian's] document requests are part of a plan to pursue an improper purpose."[58] Less than a week later, on February 23, 2024, the Defendant shared a proposed confidentiality agreement that included, in the event of a breach of the confidentiality agreement by Christian, that the Defendant would report Christian to the State Bar of California, where he is admitted to practice law.[59]

---

[56] *Id.* at 4.

[57] *Id.* at 5–6.

[58] *Id.* at 6.

[59] JX128.

## II.    PROCEDURAL POSTURE

Dissatisfied with the way things were progressing, on February 24, 2025, the Plaintiffs initiated this action seeking court-ordered production and fee shifting.[60] The Chancellor promptly assigned the matter to me on February 25, 2025, directing the parties to meet and confer and submit a proposed schedule within one week.[61]

That deadline came and went, while the parties prioritized their continuing settlement discussions over expedited litigation in this Court. The parties ultimately submitted a proposed schedule on April 1, 2025, contemplating trial in June.[62] I granted the proposed schedule and set this matter for a full day trial on June 3, 2025.[63]

During the pleading stage, and when discussing scheduling, the parties continued to work on a confidentiality agreement and voluntary production. The parties ultimately executed a confidentiality agreement after much back-and-forth,[64]

---

[60] D.I. 1.

[61] D.I. 5.

[62] D.I. 11.

[63] D.I. 12. This litigation was nearly knocked off track after the Defendant noticed an annual meeting on March 11, 2025. Pretrial Order p. 30 ¶ 82. The Plaintiffs moved for a temporary restraining order, and I quickly set a briefing schedule and scheduled an expedited hearing. D.I. 23–24. By the reply deadline, the parties resolved the dispute by stipulation, agreeing the Defendant would postpone the 2025 annual meeting until at least sixty days after entry of a final judgment in this action. D.I. 28. I granted the stipulated order, cancelled the hearing, and we were back to pre-trial preparations. D.I. 29.

[64] *See* JX145; JX149; JX 150; JX 154; JX157; JX161; JX166; JX169–71.

and on April 21, 2025, the Defendant made its initial production consisting of 223 pages, roughly sixty-three documents.[65] The Plaintiffs identified several discrepancies and concerns,[66] and the Defendant made five supplemental, voluntary productions thereafter, consisting of 287 pages, roughly fifty-four documents.[67]

The Plaintiffs were not satisfied with these productions and pressed forward with our June trial. At the May 27, 2025 pre-trial conference, I addressed a few final disputes about how our June trial would proceed. First, I directed the parties to use their trial time wisely by focusing on presenting their evidence, saving argument for post-trial briefing. Second, I overruled the Plaintiffs' objection to two of the Defendant's witnesses; I shared the Plaintiffs' concern about the timing of disclosure but found the potential prejudice in exclusion outweighed the prejudice from inclusion. I explained, however, that I expected the testimony to be limited and tailored to the scope of this proceeding. Third, and finally, I overruled the Defendant's objection to evidence related to the Jupiter Notes; I explained, and

---

[65] Pretrial Order p. 31 ¶ 86.

[66] *See, e.g.*, Pls.' Op. Br. at 32. ("The three stock lists are not identical. They contain different names and what appear to be improper stock certificate numbers.").

[67] Pretrial Order p. 31 ¶ 86.

reiterated during trial, I would give that evidence the weight and credibility I find it deserves in the context of the full trial record.[68]

Ultimately, I presided over a full-day of trial on June 3, 2025.[69] Needing time for the Defendant's final witness, trial was continued and completed via Zoom on June 17, 2025.[70] With the complex evidentiary record, I directed the parties to submit post-trial briefing, which they completed on July 14, 2025.[71] Once public versions of all post-trial submissions were filed on July 31, 2025, I took this matter under advisement.[72]

## III. ANALYSIS

There are two primary questions before me: (1) should the Defendant be ordered to produce or disclose additional records and (2) should fees be shifted in favor of either side. I address these in turn, answering them: (1) yes, but only in part, and (2) no, but costs will be shifted in favor of the Plaintiffs as prevailing parties.

---

[68] I also denied the Defendant's request that the Plaintiffs be compelled to produce a disputed thumb drive but directed the parties to discuss offline. Pretrial Conference Tr. 43:15–20. The issue was later resolved. *See* Pls.' Post-Trial Br. at 13 n.9.

[69] D.I. 58.

[70] D.I. 62.

[71] D.I. 66–67.

[72] *See* D.I. 72.

**A.** **The Plaintiffs are entitled to further court-ordered production, but only to a limited extent, as described herein.**

The Plaintiffs want the Defendant to produce additional documents and un-redact certain documents in prior productions. For the reasons explained herein, I direct a limited production of "back up" stock certificates and stock ledgers, additional financial statements including the 2023 valuation, board-level materials that address the Jupiter Notes, and copies of executive and management compensation records. The documents previously produced by the Defendant shall also be reproduced in unredacted form. That provides only a limited production, however, and I decline the Plaintiffs' request for additional books and records subject, as explained herein, to the Defendant's certification of compliance. This matter should close once the Defendant certifies that its production is complete.

The Plaintiffs' request comes under 8 *Del. C.* § 220, which was recently amended.[73] Because the Demand was served before February 17, 2025, the retroactivity date for the recent amendments to Section 220, the prior version applies.[74] Under that prior version, a stockholder is entitled to inspect a company's

---

[73] Although there was some discussion of information rights in the stockholders' private placement memorandum, the parties have solely litigated under Section 220.

[74] *See* Del. Sen. Sub. 1 for S.B. 21, 153rd Gen. Assem. § 3 (Mar. 24, 2025) ("Sections 1 and 2 of this Act take effect on the enactment of this Act and apply to all acts and transactions, whether occurring before, on, or after the enactment of this Act, except that Sections 1 and 2 of this Act do not apply to or affect any action or proceeding commenced in a court of competent jurisdiction that is completed or pending, or any demand to inspect books and records made, on or before February 17, 2025.").

books and records if she demonstrates by a preponderance of the evidence that she "(1) is a stockholder of the company, (2) has made a written demand on the company, and (3) has a proper purpose for making the demand."[75] After meeting these three requirements, the stockholder "must then establish that each category of the books and records requested is essential and sufficient to [the stockholder's] stated purpose[s]."[76] Here, the Plaintiffs have proven proper purposes for inspection, but they have fallen short of demonstrating that all of the requested records are necessary and essential for a court-ordered production; some are, some are not.

> ### i.    The Plaintiffs have established three proper purposes for inspection.

The purposes stated in the Demand are for (i) communication with other stockholders regarding mismanagement concerns, (ii) valuation, and (iii) investigating potential wrongdoing. These are, on their face, proper purposes.[77] The

---

[75] *Paul v. China MediaExpress Holdings, Inc.*, 2012 WL 28818, at *3 (Del. Ch. Jan. 5, 2012).

[76] *Kosinski v. GGP Inc.*, 214 A.3d 944, 950 (Del. Ch. 2019) (citation omitted).

[77] A proper purpose is defined as "a purpose reasonably related to such person's interest as a stockholder." 8 *Del. C.* § 220(b). Valuation "has long been recognized as a proper purpose[.]" *Thomas & Betts Corp. v. Leviton Mfg. Co.*, 685 A.2d 702, 713 (Del. Ch. 1995), *aff'd*, 681 A.2d 1026 (Del. 1996). Likewise, "communication with other stockholders about specific matters of corporate concern, especially in connection with a pending stockholders' meeting, has consistently been held to be a proper purpose for a stockholder to obtain a stocklist." *Conservative Caucus Research, Analysis & Educ. Found., Inc. v. Chevron Corp.*, 525 A.2d 569, 571 (Del. Ch. 1987).

propriety of the Plaintiffs' valuation and communication purposes is not in real dispute; the Defendant's strongest argument is regarding the investigation purpose.

"Investigating potential wrongdoing is . . . a proper purpose" to inspect books and records.[78] But, as most recently articulated by the Delaware Supreme Court: "A mere statement of a purpose to investigate possible general mismanagement, without more, is insufficient to establish entitlement to inspection. But the 'more' that Section 220 requires is not a narrower or more 'lucid' purpose. Instead, a stockholder must present some evidence to establish a credible basis of mismanagement or wrongdoing warranting further investigation."[79] This is the lowest possible burden of proof requiring only a credible showing that there are legitimate issues of wrongdoing. The Plaintiffs met that burden.

The Plaintiffs established a credible basis of mismanagement of, or wrongdoing in connection with, the Defendant's business. The Defendant's financial information raises more questions than it answers and is, at best, incomplete and, at worst, inaccurate. The Defendant's stock ledgers are also conflicting, and the Defendant's cancellation and backtracking on Cameron's interests and its purported requirement for accredited investor status raises concerns worthy of investigation.

---

[78] *Sanders v. Ohmite Hldgs., LLC*, 17 A.3d 1186, 1193 (Del. Ch. 2011).

[79] *Roberta Ann K.W. Wong Leung Revocable Tr. v. Amazon.com, Inc.*, 2025 WL 2104036, at *7 (Del. July 28, 2025) (citations and quotation marks omitted).

Plus, the Defendant has not held a formal annual meeting in over five years and its periodic disclosures varied in level and specificity of detail. Taken together, these provide a more than credible basis to suspect mismanagement or wrongdoing, supporting a court-ordered inspection.[80]

The Plaintiffs have, therefore, proven three proper purposes for inspection: valuation, communication, and investigating potential mismanagement or wrongdoing in connection the (1) financial management of the Defendant, (2) maintenance of the Defendant's stock ledger, (3) disparate requirements for, or treatment of, stockholders, and (4) the failure to hold annual meetings.

### ii. The Defendant has failed to prove pretext.

When a stockholder plaintiff has established a proper purpose, the defendant corporation may, nonetheless, defeat a court-ordered production by demonstrating

---

[80] In articulating the credible showing this way, I have rejected two additional theories. The Plaintiffs' concerns about the Parkers, even on the low credible basis test, are too speculative to support any further inspection. And the dividend concern appears misplaced with the cover sheet that went out with the K-1, as further explained at trial. *See* JX445; Wade Tr. 179:11–23. The Plaintiffs' briefing also arguably expanded the purported mismanagement and wrongdoing. *See* Pls.' Op. Br. at 40–41. I agree with the Defendant that the Plaintiffs cannot expand the Demand through briefing. Def.'s Op. Br. at 51–52. *See also An v. Archblock, Inc.*, 2023 WL 7320253, at *4 (Del. Ch. Nov. 7, 2023) (holding that a plaintiff may not expand their demand through litigation); *Grimm v. Stem, Inc.*, 2024 WL 5319597, at *1, n.3 (Del. Ch. Oct. 13, 2014) ("During oral argument, [plaintiff] articulated a new purpose for inspection; valuation of his stock in [the Defendant] . . . . Because this purpose was not stated in the Demand, I decline to consider it in resolving [plaintiff]'s summary judgment motion."). I thus limit my analysis to the scope of the Demand. JX111.

that the proper purpose "is not the actual purpose. In other words, the defendant may try to show that the plaintiff has pursued its claim under false pretense."[81] Through this burden shift, the Defendant must "prove that the [Plaintiffs'] avowed purpose[s] [are] not [their] actual purpose[s] and that [their] actual purpose for conducting the inspection is improper."[82] The Defendant has failed to meet this burden.

The Defendant avers that this Section 220 action is an "additional weapon against Brandt" in other litigation referenced above,[83] or is a means to gain an advantage in either the conservatorship of Mrs. Jupiter or the probate of Mr. Jupiter's estate.[84] The Defendant's concern is understandable, given the many blurred lines. For example, Christian opposed Brandt's application to serve as special administrator of Mr. Jupiter's estate based, at least in part, on how Brandt has managed the Defendant and responded to information requests.[85] And Wade and Brandt testified that Christian confirmed his personal crusade to make them miserable, something Christian denies.[86] But, at most, the Defendant has established

---

[81] *Sutherland v. Dardanelle Timber Co.*, 2006 WL 1451531, at *8 (Del. Ch. May 16, 2006).

[82] *Woods Tr. of Avery L. Woods Tr. v. Sahara Enters., Inc.*, 238 A.3d 879, 891 (Del. Ch. 2020)

[83] *See* Def.'s Answering Br. at 16–19.

[84] Wade Tr. 196:6–11.

[85] JX75 at 5–6.

[86] *Compare* JX424 at 3 and JX425 at 3 *with* Christian Tr. 43:19–45:24.

ongoing animosity between Christian and the Brooksbys; it has not established an ulterior purpose over and above the Plaintiffs' proper purposes for inspection.

### iii. Most of the necessary and essential documents have been produced, but more disclosure is warranted.

Once a stockholder has proven proper purposes for inspection, and the corporation cannot overcome those with proof of a superseding ulterior purpose, this Court will order production of records necessary and essential to the proven purposes. "Documents are necessary and essential pursuant to a Section 220 demand if they address the crux of the shareholder's purpose and if that information is unavailable from another source."[87]

> The necessary and essential standard is a demanding one: the Court must narrowly tailor the inspection right to a stockholder's stated purpose. . . . The court must give the petitioner everything that is essential, but stop at what is sufficient. In determining the scope of inspection, the Court may consider the information previously furnished by the corporation.[88]

The Plaintiffs argued, in their post-trial brief, that this Court should direct the Defendant to "produce all documents that are responsive to the . . . Demand and related, refined requests."[89] The Plaintiffs, essentially, ask that I flip the burden on the Defendant arguing, the Defendant "has not reasonably identified any documents

---

[87] *Kosinski*, 214 A.3d at 957.

[88] *In re Aspen Tech., Inc., Section 220 Litig.*, 2025 WL 2828269, at *2 (Del. Ch. Oct. 6, 2025) (cleaned up).

[89] Pls.' Post-Trial Br. at 35.

that are not necessary and essential to [the] Plaintiffs' proper purposes."[90] The Plaintiffs also argue that the Defendant waived the ability to contest certain records as not essential.[91] I decline these burden shifting approaches. They are unwarranted and against Delaware law.[92]

The parties have, however, joined issue on scope. Initially, the Plaintiffs provided a chart in connection with pre-trial briefing. Then, attached to its post-trial brief, the Defendant provided an updated chart comparing the requests in the Demand with the records produced to date. I start with the Defendant's chart, run through each row in turn, and explain what more (if anything) needs to be produced:

1. Although the Defendant has provided three versions of the stock ledger, inconsistencies persist, and additional production is necessary and essential. The Defendant shall produce the "back up" it claims to have of every stock certificate issued and the physical iterations of the stock ledger.

2. The Defendant need not produce anything further in response to the second row, provided that the Defendant certifies the completeness of its voluntary productions as addressed below.

3. The Defendant must produce additional financial statements. The Defendant produced financials in what was admitted as JX181.

---

[90] *Id.*

[91] *Id.*

[92] The Plaintiffs bore the burden to prove that all records requested are necessary and essential to their proper purposes for inspection. They were required to articulate the categories or type of records for which they seek production and tie those directly, and persuasively, to their purposes. *See, e.g.*, *Garner v. Authenticity.ai Invs.*, 334 A.3d 1108, 1129 (Del. Ch. 2025) (lamenting "[t]he Plaintiff's lackadaisical treatment of his burden" and the need to "direct[] the parties to put together a joint chart identifying, request by request, '[t]he documents that were produced [and] the documents that exist for further production' along with each side's response").

The Plaintiffs have articulated a need for financial statements for the stub period to present and any formal valuations, including the 2023 valuation.[93] The Plaintiffs have not, however, justified further intrusion requiring a court-ordered production of the underlying bank statements.

4. The Defendant need not produce anything further in response to the fourth row, which overlaps with court-ordered production addressed elsewhere herein.

5. The Plaintiffs' sought board materials regarding the consideration of and approval of any financial transaction of the Defendant. Although not specifically identified in this request, the board's treatment of the Jupiter Notes and the varying explanations for their absence from the financial records creates an inconsistent, incomplete record. Additional production is necessary and essential to the Plaintiffs' purposes for inspection. The Defendant must produce any board-level materials that address the treatment, conversion, or consideration of the Jupiter Notes.

6. The Defendant need not produce anything further in response to the sixth row, provided that the Defendant certifies the completeness of its voluntary productions as addressed below.

7. The Plaintiffs demanded "all records and documents" related to the Defendant's 2019 Private Placement Memoranda (the "PPM"). The Defendant has produced the PPM, but nothing more. The Plaintiffs failed to articulate what, short of "all records and documents," are necessary and essential to their purposes. No further production will be ordered.

8. As represented in post-trial briefing, the Defendant "voluntarily produced documents breaking out its total executive compensation" after trial.[94] But, per the Plaintiffs, this is merely a "one-page heavily redacted statement of operations with a line item for management[.]"[95] I agree this is insufficient and that copies of executive and management compensation records are

---

[93] *See* Wade Tr. 193:5–11.

[94] Def.'s Post-Trial Br. at 31 (citing JX451).

[95] Pls.' Post-Trial Br. at 35.

28

necessary and essential toward the Plaintiffs' purposes for inspection.

9. The Defendant need not produce anything further in response to the nineth row, provided that the Defendant certifies the completeness of its voluntary productions as addressed below.

10. The Defendant need not produce anything further in response to the tenth row, provided that the Defendant certifies the completeness of its voluntary productions as addressed below.

11. The Defendant need not produce anything further in response to the eleventh row, provided that the Defendant certifies the completeness of its voluntary productions as addressed below.

12. The Defendant need not produce anything further in response to the twelve row, provided that the Defendant certifies the completeness of its voluntary productions as addressed below.

13. The Defendant need not produce anything further in response to the thirteenth row, provided that the Defendant certifies the completeness of its voluntary productions as addressed below.

14. The Defendant need not produce anything further in response to the fourteenth row, provided that the Defendant certifies the completeness of its voluntary productions as addressed below.

15. The Plaintiffs seek copies of current directors' and officers' liability insurance; the Defendant argues they are not necessary and essential to any purposes. The Plaintiffs have failed to articulate otherwise and have not met their burden for a court-ordered production.

Any additional types or categories of records that were requested but are not addressed in the above list are rejected as outside either the scope of the Demand or the records necessary and essential to the proper purposes I found earlier herein.

The Plaintiffs also seek a court order requiring that previously produced documents be unredacted. The Defendant failed to join issue on this request in the post-trial briefing. Absent a redaction log or any response from the Defendant

29

providing the basis for the redactions, I grant the Plaintiffs' request. The Defendant shall reproduce unredacted versions of these documents.

Finally, the Plaintiffs request a certification confirming when the Defendant's production of documents is complete with respect to each category of documents. This request is granted for the prior productions, as addressed above, and for this court-ordered production.

### D. The parties shall each bear their own fees; costs shall be shifted to the Plaintiffs as the prevailing parties.

The parties each ask that I shift fees and costs to the other side under the bad faith exception to the American Rule.[96] "Delaware follows the American rule on fees and costs, and in a Section 220 action, each party bears its own attorney's fees unless there is an exception to that rule."[97] Both sides seek to invoke the bad faith exception. "Bad faith means a litigation position in furtherance of abuse of process that is manifestly incompatible with justice. It means [a] frivolous . . . attempt to game the system."[98] "The Court typically will not find a litigant acted in bad faith for purposes

---

[96] *See* Pls.' Op. Br. at 53–56; Def.'s Answering Br. at 59–60.

[97] *Donnelly v. Keryx Biopharmaceuticals, Inc.*, 2019 WL 5446015, at *6 (Del. Ch. Oct. 24, 2019).

[98] *Id.*

30

of shifting attorneys' fees unless the litigant's conduct rose to the level of 'glaring egregiousness.'"[99]

Neither side has met this high bar and fees will not be shifted.

But I will shift costs in the Plaintiffs' favor. Under Court of Chancery Rule 54(d), "costs shall be allowed as of course to the prevailing party unless the Court otherwise directs."[100] This Court has defined a prevailing party as "the party who successfully prevails on the merits of the main issue or on *most* of her claims."[101] Here, although I issue a mixed ruling, the Plaintiffs have prevailed on the main issue or most of their claims. Costs shall be shifted in their favor.

## IV. CONCLUSION

For these reasons, I direct a limited production of "back up" stock certificates and stock ledgers, additional financial statements including the 2023 valuation, board-level materials that address the Jupiter Notes, and copies of executive and management compensation records. The redacted documents previously produced by the Defendant shall be reproduced in unredacted form and the Defendant shall certify complete production. I decline to shift fees but do shift costs to the Plaintiffs

---

[99] *eBay Domestic Hldgs., Inc. v. Newmark,* 16 A.3d 1, 47 (Del. Ch. 2010) (citation omitted).

[100] Ct. Ch. R. 54(d).

[101] *Adams v. Calvarese Farms Maint. Corp.*, 2011 WL 383862, at *3 (Del. Ch. Jan. 13, 2011) (emphasis in original).

as the prevailing parties. This is my final report, and exceptions may be filed within 11 days under Court of Chancery Rule 144.